KENNEDY, Respondent, v. FIRST STATE BANK OF WALL, Appellant.

(149 N. W. 168.)

1. **Evidence—Insufficiency of—Letters Contradicting Testimony—Conclusive Impeachment.**

Plaintiff's testimony was insufficient to authorize a verdict in his favor, where his unexplained letters, part of which were written when plaintiff had full knowledge that defendant was claiming the transactions referred to in the letters were as contended for by it, conclusively impeached plaintiff, and in the light of which his oral testimony lost all probative force and left nothing but the letters for the jury to consider.

McCoy, J., and Smith, P. J., dissenting.

2. **Agency—Agency for Bank—Evidence, Weight and Sufficiency.**

On the issue whether plaintiff acted as principal, or as agent for defendant bank, in a transaction involving an exchange of properties, and plaintiff's alleged indebtedness to the bank under such transaction, a witness' testimony that an officer of defendant bank said, concerning an automobile, regarding which the question whether it was owned by plaintiff, subject to defendant's rights therein as collateral security, or whether it was owned by defendant, was in issue, "It never did belong to" plaintiff; "the deal was ours all the way through,"—did not substantially corroborate plaintiff's testimony that he acted merely as the bank's agent, where his testimony was conclusively impeached by his own letters.

McCoy, J., and Smith, P. J., dissenting.

3. **Evidence—Verdict, When Will be Set Aside.**

Where a series of plaintiff's letters concerning the transaction in question contain clear and convincing evidence of the absolute correctness of defendant's claims, and the verdict in plaintiff's favor is flagrantly contrary to the evidence in the case, it will be set aside on appeal.

McCoy, J., and Smith, P. J., dissenting.

(Opinion filed October 26, 1914.)

Appeal from Circuit Court, Pennington County.   Hon. LEVI McGEE, Judge.

Action by Frank M. Kennedy against the First State Bank of Wall, S. D., a corporation, to recover the amount of an alleged deposit in defendant's bank, and certain commissions, and other moneys expended for defendant's benefit, etc.   From a judgment for plaintiff, and from an order denying a new trial, defendant appeals.   Reversed.

*Williams & Sweet,* for Appellant.

*T. H. Conniff,* and *Buel, Gardner & Denu,* for Respondent.

(1) Under point one of the opinion, Appellant submitted: Plaintiff's evidence stands alone with no corroboration. His letters are of vastly more weight as evidence than his sworn testimony, and manifestly entitled to greater consideration. Each of such letters conclusively brand his sworn statements as to agency and his non-indebtedness to the bank as utterly false. And cited:

17 Cyc. 806; Banta v. Naughton, 7 N. Y. St. 384; Merswinkel v. St. Louis F. & M. Ins. Co. (Wis.) 6 L. R. A. 200; Stevens v. Trask, Com. Pl., 18 N. Y. Supp. 117; Kehr v. Stauf, 12 Daley, 115, and cases cited.

WHITING, J. The following facts are undisputed: Plaintiff was an attorney at law engaged in the real estate business at Wall, S. D., the home of defendant corporation. In the fall of 1911 plaintiff negotiated a trade of some land in South Dakota for an automobile and a house and lot situated at Bloomfield, Neb. The South Dakota land was owned by one Collins, who was to receive for his land $500. Defendant entered into written contracts for the trade with the owner of the house and lot and the automobile, in which contracts plaintiff appeared as the party with whom the exchange was to be made. At the time the exchange was consummated an officer of defendant bank was present, and the bank paid the $500 to Collins, taking from plaintiff a demand note for the $500. The deed to the house and lot and the bill of sale of the auto ran to plaintiff. Plaintiff thereafter expended certain moneys in the repair of the auto and the repair and insurance of the building; the policy of insurance ran to him as owner. As a part of the trade the plaintiff gave back to the former owner a mortgage upon the house and lot. Plaintiff had on deposit with defendant some $200, and, in the month of November, 1911, defendant applied and credited such deposit upon the $500 note. Plaintiff afterwards drew upon defendant bank, and his check was received and honored, thus showing, on defendant's books, an overdraft of plaintiff's account. February 2, 1912, an officer of defendant bank visited Bloomfield, turned over to plaintiff all his canceled checks, and asked for and procured from plaintiff a note in favor of defendant in the amount of, and to cover, such apparent overdraft. At the same time, plaintiff gave to defendant a bill of sale of the

auto and a deed of the house and lot. The bill of sale was conditioned that, upon payment of a note for $500 given by plaintiff to defendant, if paid before April 1, 1912, such bill of sale should be null and void. Upon receipt of the deed, defendant gave back to plaintiff a contract in writing whereby defendant agreed to reconvey the land upon the payment of $400 by April 1, 1912, which $400 confessedly referred to the balance claimed to be represented by the $500 note and the note for overdraft. The automobile remained in the possession of plaintiff; no payments were made upon said note; and plaintiff, in May, 1912, delivered the automobile to defendant. The automobile and the house and lot were afterwards disposed of by defendant corporation, and the moneys received therefrom applied by it upon the $500 note and other indebtedness which it claimed to hold against plaintiff.

Plaintiff brought this action claiming that the above-mentioned exchange of property negotiated by him was negotiated by him as the agent of defendant; that, though the title to the property traded for was taken in his name, yet the transaction was, in truth, for and in behalf of defendant, which was at all times the owner of such property. Plaintiff sought to recover: first, the amount of his deposit which the bank had applied upon the $500 note; second, a commission of $75, alleged to be the amount which defendant agreed to pay plaintiff for negotiating the trade; third, moneys which he had paid out for the repair of the auto and house, storage of the auto, insurance of the house, etc.; fourth, moneys claimed to have been given to the bank in connection with the closing of the trade.

It was plaintiff's contention that it was at the instance and request of defendant that he negotiated this trade; that he acted, in everything he did, for the defendant; that it was at defendant's instance and request that the title to the Bloomfield property was taken in his name; that the note of $500 was given because defendant desired the matter to appear as a loan of $500 so that its bank books would appear better upon examination by the bank examiner, as the note could be used in place of cash; that, when he gave the note for the overdraft, he contended that he did not owe the bank anything, but that the officer to whom he gave such note assured him that this note as well as the conditional bill of sale

and the mortgage-deed, were wanted to show the bank examiner, and that he would meet him at Wall and make a final settlement.

It was defendant's contention that the transaction was in all respects what, upon its face, it purported to be—one wherein the bank had no interest whatsoever, except inasmuch as it had advanced the $500 which was necessary to close the transaction; that the bank was holden for $500 to Collins upon surrender of the deed, and therefore sent its officer to Bloomfield in charge of the deed; that plaintiff did not have the $500 with which to take up the deed, but represented that he had another trade pending whereby he expected to at once realize from a sale of the house and lot; that, relying upon his confidence in plaintiff, who at that time was a depositor in defendant bank, and upon his promise to immediately take up the note, the bank, through its officer, surrendered Collins' deed, took plaintiff's note, and paid the $500 to Collins; that defendant made demand for payment of the $500 note and, the same not being paid, it applied plaintiff's deposit thereon; that it afterwards honored plaintiff's check as it had frequently theretofore honored his overdrafts; that it then sent one of its officers to Bloomfield to procure a settlement of the overdraft and balance due upon the $500 note; that, without making any claim that he was not owing defendant anything, and fully conceding the bank's claims, plaintiff freely and voluntarily gave the note to cover such overdraft, and gave the conditional bill of sale and deed (in connection with which was the contract for reconveyance) for the purpose of securing the balance unpaid on the $500 note; that plaintiff never made any claim that he was acting for and as agent of defendant in making the trade or that he did not owe the defendant a $500 note; that plaintiff never advanced the bank any money.

The jury returned a verdict for the plaintiff upon his several causes of action; judgment was entered; motion for new trial denied; and this appeal taken. Upon this appeal the sole question that demands our attention is the sufficiency of the evidence to support the verdict.

[1] The respective contentions above set forth were supported by the oral testimony of the plaintiff upon the one part, and, upon the other part, by the oral testimony of the officers of the defendant bank and by the several exhibits or instruments referred to

above.   There was also the testimony of a party who, as agent of
plaintiff, had taken the automobile from Bloomfield to Wall and
delivered the same to defendant.  This testimony we will refer to
later.  If there had been no other evidence received upon the trial,
there would be no question but that the verdict of the jury should
be sustained, because, though plaintiff's claims were absolutely in-
consistent with what he did, yet there would be some substantial
evidence to support such verdict.  There were, however, several
letters written by plaintiff to defendant which were offered and
received in evidence.  Plaintiff acknowledged that he wrote these
letters; and, though he took the witness stand after these letters
were received in evidence, he made no attempt to explain the con-
tents thereof, which contents were entirely inconsistent with his
oral testimony and exactly in harmony with the claims of defend-
ant.  Part, at least, of these letters were written at a time when
plaintiff had full knowledge that defendant was claiming the trans-
actions to be as contended for by defendant in this action.

On January 19, 1912, which would be after his deposit had
been applied upon the $500 note, and apparently after he had been
notified that his account stood overdrawn, he wrote to defendant,
and, among other things, stated :

"I have your several letters and have neglected to write you,
as I expected to be able to send draft for the overdraft that I have
with you."

And, after referring to a certain debt of $400 which he
claimed to be owing him from some parties and which he had been
unable to collect, he said :

"I wanted to get it so I could make good with the bank, and
of corse I am unable to do so, I have the House and Autows yet
and I cannot sell them now as the weather is not right, and the
house I can not sell and realize as much cash as I would want to
have paid down, Now Carl, I will do all I can for you and will say
that I will send you a note that I hold of J. I. Beeson one for
$75.00 and for $18.00, and interest, however this does not satisfy
the overdraft yet it will help you to be safe and I will send the
money to you as soon as I get it.  *  *  *  Now I will do the
very best for you that I can and will asshure you that you will be
well paid for your trouble in this matter as I know that it is not
business and you know that it is not and that we will have to agree

on and as I have said it is not becose I have not the money it is becose I can not get it in and that is the only reason. Now I do not want to have you holding the sack for me and I can not do any different."

There could have been no overdraft if the deposit was improperly applied. Such deposit was improperly applied to the $500 note, if such note was a mere accommodation note as now claimed by plaintiff. According to plaintiff's present contentions, there was no debt for him to pay with the $400. It will be noticed, however, that $400 would just about pay the balance due on the $500 note and the overdraft. If the house and auto belonged to the bank, the amount for which it should be sold and the terms of sale would both be for the bank, and not for plaintiff, to determine. On March 29, 1912, just before his time to redeem the auto and the house and lot would expire, plaintiff again wrote the bank, and, among other things, said:

"I will write you as to our deal as it is now soon April 1st and I have not sold the house or autos. I can not do any thing on same. Now Kneeland [officer of defendant] wanted me to ship the E. M. F. [the auto traded for] up their and sell it. Now I cannot see how I would Be able to sell it their as no one has the cash to buy it and it would cost me about $40.00 to get it up on the cars, and perhaps not be any better off than I am now. I told Kneeland that I would borrow the money here and pay you people up and I will yet I cannot just now. * * * Now I do not want your bank to be out the money any longer than you can, I am and have always been sorry this deal was made yet I am into it and will stick out until I make it. Now it is a sinch I can not get the money to you as we had planned, and now it up to you to say what to do I offered the car to Kneeland and he thinks I have knocked the car out and that it all in. Now he is badly wrong as the car is in fine shape much better than when he was here and also when you see it as I had it overhauled Repaired and fixed up and it has cost me about $50.00 and the car is now as good as any new car of it Model, or I will say I do not want to losse any money in the Deal, yet if you insist I must. Now I will be glad to have some time on this and I will sell one of them the first chance I get and settle with the Bank or as I have said Mortg the whole outfit and get the money in that way. So as I have

explained all now write me and let me know what you want me to do, and it will be done."

We can hardly imagine how any one could make a plainer or franker admission that this deal was his own. Upon April 6, 1912, the plaintiff, writing about this transaction, and especially about the auto—which he now claims was at that very time the property of defendant—said:

"Your letter at hand as to the E. M. F. 30 H. P. car will say that this car is worth $700 and is worth the money, and I could get it here later on yet the roads are not good yet and will not be any demand for cars for some time. Now I will lay this car down in Wall in first shape and come up and start it out and see that it is in first class condition for $600.00 that would leave it net me about $500.00 after all expenses are paid as the freight is going to be high. * * * Now I will ship as soon as car comes to ship in and I will say that I have the car in fine shape. Now I do not want to make any money on you of this car, and the only thing I will say if you do not think the car is worth the money I hold it after you have tried it out, do not say anything and I may be able to close a deal with some other party. I do not want a trade and have not been looking for one."

Certainly plaintiff could not have made a plainer admission that the auto was his own. Two days later, after finding that it would be more expensive to ship the auto than he had expected, plaintiff again wrote asking the bank to send some one down to look the car over and see if it would take it. Among other things, plaintiff, in said letter, said:

"I would like to have you come down and look the car over and if you want it I would let you have it cheaper than I would any one."

Why should he write thus if the car already belonged to defendant? Plaintiff wrote another letter which is undated, but which apparently was written after April 8, 1912, and prior to April 28, 1912. After speaking of conditions which had already caused delay in driving the auto across country and might cause such delay as to lead him to ship it, plaintiff said:

"I would want all the notes and sent me here as I may not be up for some time as I do not look for any one to leave here for at least a month, and I will let you have the car for $500 net to

me as this is cheap for the car. * * * Hoping that we can deliver the car to you at once and that every thing will be O. K."

Upon April 28, 1912, plaintiff started this car overland in charge of one Fuller, and, upon that date, wrote to the bank, stating, among other things:

"I am starting Harry with the car today and he will deliver same to you. Now you turn over the notes and all papers to him, also make draft out for the diferance that I owe the bank. Now $600.00 is the least I can take for the car and come out as the cost of delivery will make it expensive. * * * Deliver papers to Harry Fuller and make out draft for all over the amount of the notes and interest, which should be about $400.00 total due you."

Here again we find a claim that the car is his and an admission that he owes the defendant the amount which it claimed he owed. Plaintiff also gave Fuller a letter to the bank, a part of which was as follows:

"Now you deliver all notes, deed & bill of sale you can keep as that will do in this deal, and make out draft for all over what I owe your bank. * * * Now I can not come out on less than $600.00 and every one here claims it worth more, yet I could not find cash buyer and you want your money, so I am forced to make the best of this deal. I am not going to be any ahead on this deal, yet we must be honest with all men, and I hope my word is as good as cash, when I am able to make it so. I know you people have misjudged me, and think I am not doing the right thing, yet I am. Trusting that you will see your way clear to give me an even brake I am yours truly."

Another claim of title to car and admission of indebtedness to defendant.

Upon the admission of these letters in evidence, the oral testimony of plaintiff lost all probative force as evidence of the nature of the transaction between these parties. It was not a question of ordinary impeachment where a jury might discredit the impeaching evidence, and therefore still base a verdict upon the testimony of the party sought to have been impeached. The contents of these letters being unexplained, they conclusively impeached plaintiff, and left nothing for the jury to consider so far as his oral

evidence was concerned. As was well said by the court in Stevens v. Trask (Com. Pl.) 18 N. Y. Supp. 117:

"A judgment which rests solely upon the weight to be attached to the credibility and recollection of a party who is of course interested in the result, and who is contradicted by the party's own writings and conduct, should not be permitted to stand."

[2] But plaintiff contends that his evidence was corroborated by the witness Fuller, the party who delivered the auto for him. There might be something to this contention, provided that, in the light of plaintiff's letters, there had been left anything to corroborate. Affiant having been so thoroughly impeached that his testimony could not itself support a verdict, such verdict must find its sole support, if any, in the testimony of the witness Fuller. This witness stated that, in a conversation which he had with Mr. Kneeland, one of the officers of the bank, after he had delivered the automobile, the following occurred:

"He says to me: 'Now, I don't know whether you understand this deal or not.' I says: 'No; I don't; I don't know anything about it.' 'Well,' he says, 'we got the instructions from Mr. Kennedy,' that I handed him the day before. 'Now,' he says, 'we have a bill of sale of this car—a conditional bill of sale of this car—that expires on the 1st day of April. Mr. Kennedy has relinquished all rights to the car. In fact, it never did belong to Mr. Kennedy; the deal was ours all the way through.' I says: 'All right; I don't know anything about it. I was sent with the car and that is all I know.' He meant the deal about the car and the trade of the Bloomfield property."

Plaintiff relies for his so-called corroboration upon Fuller's testimony that the bank officer said:

"In fact, it never did belong to Mr. Kennedy, the deal was ours all the way through."

Mr. Kneeland denied that he ever stated to Fuller that the deal was the bank's; but, conceding that Kneeland made the statement as claimed by Fuller, it was wholly insufficient, as against the written evidences of the transaction itself, the letters of plaintiff—filled as they were with statements showing the whole transaction to be as claimed by defendant, and the testimony of defend-

ant's officers—to furnish substantial evidence sufficient to support
a verdict for plaintiff. To allow such verdict to stand, in the light
of the whole record, would be a travesty on justice such as no
court, posing as a court of justice, should sanction. If Kneeland
used these words, he may well have meant merely that the bank
was the real party in interest, being the only one having money in
the deal.

[3] The court well said in Geier v. Howells, 47 Colo. 345, 107
Pac. 255, 27 L. R. A. (N. S.) 786:

"A judgment based upon facts supported by substantial evi-
dence will not be disturbed on review; but where it is but slightly
supported by the evidence, or manifestly against its weight, or
where a fact upon which the prevailing party predicates his right
to the judgment rendered, must be established by clear and con-
vincing testimony, and it is not, it cannot be permitted to stand."

With the evidence showing the contracts of exchange made by
him in his own name, the deed and bill of sale running to him as
grantee, his $500 note given to defendant, the claimed overdraft
recognized by his note for same, this apparent indebtedness secured
by the conditional bill of sale and deed with contract for recon-
veyance, it was certainly incumbent upon plaintiff, as stated in
Geier v. Howells, supra, to establish by "clear and convincing
testimony" that these writings did not truthfully evidence the
transaction between the parties. Instead of testimony of that grade
esablishing his contentions, we find his letters, written at a time
and under circumstances when he would have every reason to de-
nounce defendant's claims if they were unjust, containing "clear
and convincing" evidence of the absolute correctness of defendant's
claims. We agree fully with the statement found in 2 R. C. L.
§ 167, where, in discussing the law in relation to an appellate
court's right to set aside verdicts for want of evidence to support
same, the author, after stating that under the weight of authority
the question to be determined by an appellate court "is no longer
one as to the preponderance of the evidence, but only as to whether
or not the evidence was legally sufficient to support the verdict,"
and that "it must be remembered that the fact that the reviewing
court would have reached a different conclusion does not of itself
require a reversal," declares:

"But while a reviewing court hesitates to set aside a verdict

on the ground of insufficiency of the evidence, especially when the trial judge has refused to do so, still, if it is flagrantly contrary to the evidence, and the court is convinced that an injustice has been done, it will and should set it aside, not only in criminal, but also in civil, cases."

It may be that defendant did not fully regard plaintiff's rights when it sold the house and lot and the auto, and it is quite possible, and even probable, that the jury were moved to their verdict by the evidence that was received in relation to that matter—a matter entirely immaterial under the issues of this case.

The judgment and order appealed from are reversed.

McCOY, J. (dissenting).    I am unable to concur in the majority opinion for the reason, as it seems to me, it is in violation of the well-established elementary rule that a verdict based on a substantial conflict in the evidence will not be disturbed on appeal. One of the vital, substantial issues in this case was whether or not respondent or appellant was the principal in a certain business transaction relating to a trade involving real estate and personal property.    Respondent, in substance, testified that he was not the real principal in such transaction, that he was merely an agent, or a sort of "go-between," for appellant; that appellant was, in fact, the real party to the trade, but that the transaction, by mutual agreement between respondent and appellant's officers, was so carried out as to make it appear on its face that respondent was the real party, for the reason that appellant, being a bank, and using the funds of the bank, did not desire it to appear that it was, in fact, transacting such deal; that the notes and indebtedness appearing to have been made by respondent as a part of said trade were shams for the purpose of enabling the officers of said bank to make it appear on the books of said bank that respondent was the real party.    In opposition to this evidence of respondent, appellant offered in evidence the letters of respondent, wherein respondent mentioned the notes and indebtedness as his own, and which letters on the face of them were apparently in direct conflict with his oral testimony.    There is nothing apparent in these letters that would indicate that the notes or the indebtedness were shams.    The officers of the bank also testified that respondent was the real party to the transaction, and that the money furnished in the deal as represented by the notes was furnished to respondent to enable

him to carry out the transaction on his own behalf. It also appears from the evidence that the fruits of the trade—a house and a lot in Nebraska and an automobile—were at first taken in the name of respondent, and that afterwards respondent, by deed and bill of sale, transferred the title to appellant. Appellant contends that this deed and bill of sale were taken as security to respondent's indebtedness growing out of the transaction. Yet appellant, when it obtained possession of this real and personal property, sold and disposed of the same as its own absolute property, instead of foreclosing its alleged lien thereon; and it appropriated the whole of the proceeds thereof to its own use and benefit. According to the testimony of respondent, the value of the house and lot and automobile was some $500 in excess of the amount of indebtedness represented by said alleged sham notes. It also appears from the evidence in this case that respondent sent said automobile to appellant by one Fuller, with instructions not to deliver the same to appellant until appellant paid to Fuller the difference between the amount appearing to be due on the notes and $600, the value of the automobile; that in some manner appellant obtained possession of the automobile without making the payment, and when Fuller was endeavoring to obtain this difference, according to the testimony of Fuller, the president of the appellant said to him:

"I don't know whether you understand this deal or not. Now, we have a conditional bill of sale of this car that expires the 1st day of April. Mr. Kennedy has released all his rights to the car. In fact, it never did belong to Mr. Kennedy; the deal was ours all the way through."

I am clearly of the view, notwithstanding the letters of respondent, that, under the whole evidence and surrounding circumstances, there was a substantial conflict on the issue as to whether or not respondent was the real party to the transaction in question; and that the verdict of the jury should not be disturbed. It was the sole and exclusive province of the jury to determine this conflict.

SMITH, P. J. (dissenting). The majority opinion approves the rule applied in Geier v. Howells, 47 Colo. 345, 107 Pac. 255, 27 L. R. A. (N. S.) 786, which seems to hold that, where the testimony of an interested party plaintiff upon whom rests the burden of proof is disputed by the defendant, the appellate court

is at liberty to set aside the verdict of a jury against the defendant, the court saying:

"There was not a scintilla of testimony to sustain the verdict except the testimony of the plaintiff himself."

This seems to me a somewhat novel view of the well-settled proposition that the verdict of a jury will not be overturned by an appellate court, when the evidence is substantially conflicting. The rule stated by the Colorado court, and as quoted by this court, namely:

"A judgment based upon facts supported by substantial evidence, will not be disturbed on review; but where it is but slightly supported by the evidence, or manifestly against its weight, or where a fact upon which the prevailing party predicates his right to the judgment rendered, must be established by clear and convincing testimony, and it is not—it cannot be—permitted to stand" —has been applied in actions tried by a court, but is not the rule in cases tried by a jury.

The view that the oral testimony of a witness may be so utterly annihilated by impeaching evidence, that it cannot even be corroborated, "because nothing is left to corroborate," is entirely novel to me. If this statement is logical, a dozen unimpeachable witnesses might have fully corroborated in every particular plaintiff's original testimony in this case. Yet, because of his impeachment by his own written statements, a verdict in his favor could not stand. It may be true, as suggested, that the weight of evidence in this case is in favor of defendant; but the oral evidence of plaintiff, while that of an interested witness, was positive and direct, and was corroborated very materially by the testimony of Fuller. I think the verdict of juries upon controverted questions of fact, fairly submitted, should not be lightly disturbed by this court. If it be conceded that the Legislature, in its wisdom, may confer upon an appellate court authority to disregard a finding of fact by a trial court or a referee in an equity suit, whenever, in its judgment, such finding is not clearly sustained by a preponderance of the evidence, yet the Legislature cannot confer upon an appellate court the same right to disregard the verdict of a jury. The Constitution declares that the right of trial by jury shall remain inviolate. The very essence of such right is the right of a citizen to demand that disputed questions of fact be decided by a

jury, and that their decision stand as decisive of legal rights. It may be conceded that the scintilla rule has been generally abandoned, but another rule has been almost universally adopted in its place, which has been many times recognized and declared by this court, and which should not now be abandoned. Since the earliest days, the territorial court and this court have adhered to the rule which is stated in Weiss v. Evans, 13 S. D. 185, 82 N. W. 388:

"The real and only question to be solved and answered is: Is there *any legal evidence* upon which the verdict can properly be based, and the conclusion embraced in and covered by it be fairly reached? It is the province of the jury to weigh and pass upon the evidence; to reconcile conflicting testimony; to determine the *truth* or *value* of evidence; to ascertain and declare, from all of the evidence and testimony, the facts of the case; and from the facts, when ascertained by them, and the law as given to them by the court, to arrive at and announce their decision, which is their verdict."

In the application of this rule, a distinction is drawn between the power of the trial court and the appellate court, which is based upon the fact that the trial judge heard the testimony of the witnesses, observed their conduct, and is thus able to judge of the weight of the evidence and the credibility of the witnesses. I think this rule marks the extreme limit to which courts may go, in their disregard of the decisions of juries. The rule is stated in Dickinson v. Hahn, 23 S. D. 65, 119 N. W. 1034, as follows:

"While a trial court is authorized on a motion for a new trial to grant such motion upon the ground that in its opinion the verdict is against the weight of the evidence, and for the purposes of determining that question will take into consideration the whole evidence in the case, this court, in reviewing the decision of the trial court, can only go so far as to determine whether or not the plaintiff has given sufficient legal evidence to justify the jury in finding a verdict in his favor, regardless of the evidence on the part of the defendant, except so far as the same may tend to support the plaintiff's case."

This rule does not permit the appellate court to disregard testimony which, if unimpeached, would sustain the verdict. The impeachment of a witness in any manner is a fact tending to affect his credibility, and the question of credibility is always for the trial

jury, or a trial court in the exercise of its so-called discretion in granting a new trial. But an appellate court is not authorized to pass upon the credibility of a witness, whether his testimony be impeached or unimpeached. For these reasons, I cannot concur in the conclusion announced by the majority opinion, but concur in Justice McCOY'S statement of the evidence, the issue, and his reasoning and conclusion.